UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SMART MEDICAL SOLUTIONS LLC,

                                Plaintiff,

   -against-

MEDDCARE CORPORATION and
KULBHUSHAN JOHAR

                                Defendant.

**MEMORANDUM AND ORDER**

22-cv-05824 (LDH) (TAM)

---

L<small>A</small>SHANN D<small>E</small>ARCY HALL, United States District Judge:

      Smart Medical Solutions LLC ("Plaintiff") brings the instant action against Meddcare Corporation ("Defendant Meddcare") and Kuhlbhushan Johar ("Defendant Johar") (collectively, "Defendants") alleging breach of contract, fraud, breach of implied duty of good faith and fair dealing, unjust enrichment, and conversion. (Compl. ¶¶ 40-77, ECF No. 1.) [1] Plaintiff moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on its breach of contract claim against Defendant Meddcare and its fraud claim against Defendants. (Pl.'s Mem. L. Supp. Mot. Summ. J. ("Pl.'s Mem.") at 1-2, ECF No. 47-1.)

---

[1] Plaintiff's claims for breach of contract and breach of implied duty of good faith and fair dealing are asserted against Defendant Meddcare only. (Compl. ¶¶ 40-49, 63-66, ECF. No. 1.) Plaintiff's remaining claims—fraud, unjust enrichment, and conversion—are construed to be brought against both Defendants. (*Id.* ¶¶ 50-62; 67-72, 73-77.)

1

## Undisputed Facts[2]

Plaintiff is a medical supplies distributor. (Defs.' Resp. 56.1 ¶ 1, ECF No. 47-24.) During the "relevant time,"[3] Defendant Meddcare—owned by Defendant Johar, its President—was a supplier and manufacturer of various health care products. (*Id.* ¶¶ 2-3.) Beginning in Spring 2020, the COVID-19 pandemic created high demand for disposable medical gloves made from nitrile. (Defs.' Resp. 56.1, Counterstatement of Undisputed Material Facts ("Defs.' Counterstatement") ¶ 2.) Considering this demand, Defendant Meddcare worked with numerous companies based in China and Thailand to procure nitrile gloves for sale to U.S. customers. (*Id.* ¶ 5.) On or about November 5, 2020, Defendants placed an order for 2,450,000 boxes of nitrile gloves, to be delivered over a 12-month period, from a third-party factory in Thailand named "BestSafe." (Defs.' Resp. 56.1 ¶ 4.) Defendants had not conducted business with BestSafe prior to the placement of this order. (*Id.* ¶ 5.)

At an unspecified time, a salesperson introduced Plaintiff and Defendants. (*Id.* ¶ 12.) The parties dispute whether, at or around this time, Defendants represented to Plaintiff that Defendants held a factory in which they manufactured their own products. (Defs.' Resp. 56.1 ¶¶ 13, 14.) Regardless, on or about January 14, 2021, the parties executed an agreement for Defendant Meddcare to provide Plaintiff with 10,680 boxes of pure nitrile gloves, at a rate of

---

[2] Unless otherwise indicated, the undisputed facts are taken from the parties' statements of material facts and annexed exhibits, pursuant to Local Rule 56.1. To the extent any fact is disputed, it is so indicated. Facts that are not contradicted by citations to admissible evidence are deemed admitted. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."). In contravention of this Court's rules, Defendants rely, in part, on a new declaration by Defendant Johar, dated December 5, 2024, which was not provided or cited in conjunction with Defendants' responses to Plaintiff's 56.1 Statement. (*See* Defs.' Mem. L. Opp'n Mot. Dismiss ("Defs.' Opp'n"), ECF No. 47-25; Defs.' Response Rule 56.1 Statement ("Defs.' Resp. 56.1"), ECF No. 47-24; *see generally* Decl. of Kulbhushan Johar ("Johar Decl."), ECF No. 47-26.) It will not be considered. *See* Court's Individual Practices, § III(A)(6)(i)-(l).

[3] The parties do not specify the "relevant time."

$101 per box, for a total purchase price of $1,078,680 (the "Original Contract"). (Defs.' Resp. 56.1 ¶ 16.) To fulfill Plaintiff's order, Defendants planned to use gloves from the November 5, 2020 BestSafe order that they had not yet received. (*Id.* ¶ 4, 19.) The parties dispute whether Defendants told Plaintiff that Defendants were intending to source the gloves they were selling Plaintiff from an overseas factory. (Defs.' Resp. 56.1 ¶ 21.)

Pursuant to the agreement, Plaintiff paid Defendants a downpayment of $323,604. (Defs.' Resp. 56.1 ¶ 24; Shtesl Decl., Ex. 2 at 1, ECF No. 47-5.) The parties dispute whether they previously negotiated the date upon which the gloves would be shipped or delivered as part of their agreement. (Defs.' Resp. 56.1 ¶ 26.) In February 2021, Defendant Johar represented to Plaintiff that one of three nitrile gloves containers "would be ready" before February 24, 2021, and the others "would be ready" during the first week of March 2021. (Defs.' Resp. 56.1 ¶ 32; Shtesl Decl., Ex. 3 at 3, ECF No. 47-6.) In addition, Defendant Johar assured Plaintiff that he was working to expedite Plaintiff's order. (Defs.' Resp. 56.1 ¶ 33.) Yet, no gloves were delivered to Plaintiff in February 2021. (*See* Defs.' Resp. 56.1 ¶ 35.)

On March 25, 2021, Defendants informed Plaintiff that the gloves they had procured could not be delivered due to an issue with quality. (*Id.* ¶ 35.) Specifically, Defendants advised Plaintiff that the gloves failed inspection because they were hybrid gloves, which, unlike pure nitrile gloves, are susceptible to tears. (*Id.* ¶¶ 36–37.) As a result, on March 25, 2021, Plaintiff requested a refund of the downpayment paid to Defendants pursuant to the Original Contract. (*Id.* ¶ 38; *see* Shtesl Decl., Ex. 4 at 1, ECF No. 47-7; Shtesl Decl., Ex. 5 at 2, 5, ECF No. 47-8.) In response, Defendants offered a partial shipment of nitrile gloves. (*See* Defs.' Resp. 56.1 ¶ 39-40; Shtesl Decl., Ex. 4 at 2.) Specifically, Defendant Johar indicated that Defendants had additional containers of nitrile gloves and asked that Plaintiff allow him to "ship [Plaintiff] [] one

3

container now in the next few days." (Shtesl Decl., Ex. 4 at 2.) Defendant Johar further advised that these gloves had passed quality checks. (Defs.' Resp. 56.1 ¶ 45; Shtesl Decl., Ex. 5 at 3.) Plaintiff responded explaining that it could not withstand further delays and, if Defendants could not ship the gloves immediately, Plaintiff would like to cancel the order and receive its money back so that it could order gloves elsewhere. (Defs.' Resp. 56.1 ¶ 43; Shtesl Decl., Ex. 4 at 1, 3.)

On March 29, 2021, four days after Plaintiff had initially demanded a refund, Defendants agreed to provide Plaintiff with 3,500 boxes of nitrile gloves for $353,500, with the total sum owed by Plaintiff being $245,632, pursuant to a credit provided to it by Defendants (the "March 29 Agreement"). (Defs.' 56.1 ¶¶ 46-47; Shtesl Decl., Ex. 6, ECF No. 47-9.)[4] An invoice reflecting these terms was sent by Defendants to Plaintiff. (Shtesl Decl., Ex. 6.) The invoice also indicated that the gloves were ready to ship as of the date of the March 29 Agreement. (Defs.' 56.1 ¶¶ 48–49; Shtesl Decl., Ex. 6.) Unbeknownst to Plaintiff at the time, Defendants had already received another shipment of gloves from BestSafe—which also failed quality inspection. (Defs.' 56.1 ¶¶ 50-51.)

In early April 2021, after the parties entered into the March 29 Agreement, Defendants represented to Plaintiff that the gloves would be shipped to it by April 21, 2021. (*Id.* ¶ 56.) As of April 21, 2021, Defendants had neither provided Plaintiff the gloves nor advised as to when they should be expected. (Defs.' Resp. 56.1 ¶ 57.) Accordingly, on April 22, 2021, Plaintiff demanded that Defendants return the downpayment, to which Defendants agreed. (*Id.* ¶¶ 59-60.) Beginning in April 2021, and continuing for several months thereafter, Defendants repeatedly told Plaintiff that they would refund Plaintiff's downpayment within days but failed to do so.

---

[4] Defendants dispute the existence of a new agreement formed on March 29, 2021. (Defs.' Resp. 56.1 ¶ 46.) However, Defendants concede the existence of the March 29 Agreement as reflected by the invoice attached to Shtesl's Declaration at Exhibit 6. (*Id.* ¶ 47; Shtesl Decl., Ex. 6.) Further, the invoice reflects Plaintiff purchasing 3,500 boxes of nitrile gloves at a discounted rate pursuant to a payment or credit. (Shtesl Decl., Ex. 6.)

4

(*Id.* ¶¶ 60-93.)[5]  After Plaintiff voiced its frustration with Defendants unfulfilled promises, Defendant Johar promised to start sending payments on July 30, 2021.  (Defs.' Resp. 56.1 ¶ 78; Shtesl Decl., Ex. 5 at 14.)  On that date, Defendants wired $5,000 to Plaintiff and continued to promise that more payments were forthcoming.  (Defs.' Resp. 56.1 ¶ 79; Shtesl Decl., Ex. 7, ECF No. 47-10.)  Defendants made no further payments.  (Defs.' Resp. 56.1 ¶ 80.)

In early August 2021, Defendant Johar offered Plaintiff hybrid nitrile gloves.  (*Id.* ¶ 81.)[6]  In the months following Defendant Johar's offer of hybrid gloves, Defendants continued to fail to make any additional payments to Plaintiff as promised.  (*Id.* ¶ 82.)  On September 30, 2021, Defendant Johar, once again, promised to send a "small payment before [the] 12th of the month" but never followed through.  (Defs.' Resp. 56.1 ¶¶ 84–85; Shtesl Decl., Ex. 8 at 4, ECF No. 47-11.)  On October 12, 2021, Defendant Johar promised to set up a "wire and send the receipt," which he did not send, either.  (Defs.' Resp. 56.1 ¶¶ 86–87; Shtesl Decl., Ex. 8 at 3.)  To date, Defendants have failed to return Plaintiff's $323,604 downpayment, except for the one-time payment of $5,000.  (Defs.' Resp. 56.1 ¶ 97.)

## STANDARD OF REVIEW

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a

---

[5] For example, on April 28, 2021, Defendant Johar told Plaintiff: "We should be able to wire you the money early or mid next week."  (*Id.* ¶ 63; Shtesl Decl., Ex. 5 at 6.)  On May 7, 2021, Defendant Johar apologized, blaming the delay on his quarantine, but noting that he was "expecting the funds in a day or so."  (Defs.' Resp. 56.1 ¶ 65; Shtesl Decl., Ex. 5 at 6.)  On May 16, 2021, Defendant Johar said "As soon as I get the funds will wire direct to you" and added, "your money is safe 100 percent."  (Defs.' Resp. 56.1 ¶ 70; Shtesl Decl., Ex. 5 at 8.)  Two days later, on May 18, 2021, Defendant Johar promised to update Plaintiff later that day and stated, "[o]nce I send the wire I will calculate the interest or cost of your money and also add to it."  (Defs.' Resp. 56.1 ¶ 71; Shtesl Decl., Ex. 5 at 8.)  On May 23, 2021, Defendant Johar told Plaintiffs, "I am very sure this week you (sic) complete funds will be wired."  (Defs.' Resp. 56.1 ¶ 72; Shtesl Decl., Ex. 5 at 9.)

[6] Although the record does not specify, it does not appear that Plaintiff accepted Defendants' offer of hybrid gloves.

5

verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movants bear the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Once the movant meets their initial burden, the non-movant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). The Court is to believe the evidence of the non-movants and draw all justifiable inferences in their favor, *Anderson*, 477 U.S. at 255, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts, *Bellsouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).

## DISCUSSION

### I. Plaintiff is Entitled to Summary Judgment on Its Breach of Contract Claim

Rule 56(e) of the Federal Rules of Civil Procedure provides that if a non-moving party fails to oppose a summary judgement motion on a particular claim, then summary judgment, if appropriate, shall be entered against them. Fed. R. Civ. Proc. 56(e)(3). For the entry of summary judgment to be appropriate, however, a court must first examine "the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (quoting *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir.2001)). Further, consistent with the principle that district courts should avoid "the 'imprudence of wholesale adoption of a party's position,'" a court must explain its reasoning with respect to its decision made on the unopposed motion. *Vermont Teddy* Bear, 373 F.3d at 245 (quoting *Miranda v. Bennett*, 322 F.3d 171, 177 (2d Cir.2003)).

6

Here, Plaintiff's motion for summary judgment on its breach of contract claim is unopposed by Defendants. (Defs.' Opp'n at 1 n.1.) Plaintiff argues that the undisputed facts sufficiently establish its breach of contract claim against Defendant Meddcare. (Pl.'s Mem. at 4.) That is, Plaintiff argues that the undisputed facts establish the existence of an agreement under which Plaintiff performed its obligations and Defendant Meddcare did not, resulting in damages to Plaintiff. (*Id.* 4-9.) The Court agrees.

"To prevail on a breach of contract claim under New York law, a plaintiff must show [the following elements]: '(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages.'" *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 409 (2d Cir. 2023) (quoting *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022)). Plaintiff satisfies each of these elements.

First, there can be no question as to the validity of the Original Contract. (*See* Defs.' Resp. 56.1 ¶ 24 (confirming, as undisputed, that Defendants' January 13, 2021 invoice represented Plaintiff's downpayment pursuant to the Original Contract); *see also* Shtesl Decl., Ex. 1, ECF No. 47-4.) Indeed, Defendants do not dispute that a valid contract was created on or about January 14, 2021, whereby Defendant Meddcare agreed to provide Plaintiff 10,680 boxes of nitrile gloves in exchange for $1,078,680. (Defs.' Resp. 56.1 ¶ 16.) Defendants also do not dispute that, pursuant to the contract, Plaintiff was obligated to provide Defendant Meddcare with a downpayment in the amount of $323,604. (*Id.* ¶ 24; Shtesl Decl., Ex. 2.) It is further undisputed that, on or about January 14, 2021, Plaintiff satisfied this obligation by paying the downpayment. (Defs.' Resp. 56. 1 ¶ 24; Shtesl Decl., Ex. 2.) However, Defendant Meddcare never procured the gloves ordered by Plaintiff on its behalf. (*See* Defs.' Resp. 56.1 ¶ 19.)

7

Although Defendants deny the existence of the March 29 Agreement, a second contract between Plaintiff and Defendants was, in fact, created in March 2021.[7] Where a "merchant writes an invoice on the letterhead of the seller and adds the names and addresses of the buyer and the seller; the date thereof; the payment terms, the price of the goods; a description of the goods; the amount of goods and the total price of the sale, the invoice constitute[s] a writing in confirmation of the contract." *H.Daya Int'l Co. v. Arazi*, 348 F. Supp. 3d 304, 310 (S.D.N.Y. 2018) (alteration in original) (citation and internal quotation marks omitted). This is precisely the case here. (*See* Shtesl Decl., Ex. 6.)

Moreover, Defendants' argument that, because it lacks consideration, the March 29 Agreement cannot constitute a valid contract is misguided. (Defs.' Opp'n at 4-6.) It is well settled that "[f]orbearing the exercise of a right possessed by a contracting party is adequate consideration" for the formation of a new contract. *Vinifera Imports Ltd. v. Societa Agricola Castello Romitorio SRL*, No. 216CV00103ADSARL, 2020 WL 1184962, at *7 (E.D.N.Y. Mar. 12, 2020); *see Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 573 (2d Cir. 1991) ("As the district court correctly noted, forbearance to assert a valid claim, if bargained for, is sufficient consideration to support a contract."). Here, Plaintiff's decision to forego its right to be refunded for the Original Contract constitutes valid consideration for the March 29 Agreement. *See Vinifera Imports Ltd.*, No. 216CV00103ADSARL, 2020 WL 1184962, at *7; *Trans-Orient Marine Corp.*, 925 F.2d at 573. Accordingly, this Court holds that the March 29 Agreement, as memorialized in the March 29, 2021 invoice, was a valid contract.

---

[7] Fantastically, Defendants deny the existence of the March 29 Agreement; yet, they regarded as "undisputed" that their March 29, 2021 invoice "reflect[ed] the [March 29] Agreement." (Defs.' Resp. 56.1 ¶ 47; *see also* Shtesl Decl., Ex. 6.)

Under the Original Contract and the March 29 Agreement, Defendant Meddcare was required to deliver boxes of nitrile gloves to Plaintiff.  (Defs.' Resp. 56.1 ¶¶ 16, 46-47; *see also* Shtesl Decl., Exs. 1, 6.)  Yet, Defendant Meddcare concedes that it was never able "to deliver the correct quality of goods to Plaintiff."  (Defs.' Counterstatement ¶ 19.)  The parties ultimately agreed to rescind their prior agreements and for Defendant Meddcare to return the downpayment Plaintiff had paid.  (Defs.' Resp. 56.1 ¶ 60; *see* Pl.'s Mem. at 6.)  To date, Defendant Meddcare has failed to return Plaintiff's $323,604.00 downpayment, except for the one-time payment of $5,000.  (Defs.' Resp. 56.1 ¶ 97.)  Accordingly, Defendant Meddcare's breach is plain.

### a. Damages

Having established Defendant Meddcare's liability with respect to Plaintiff's breach of contract claim, the Court turns to whether Plaintiff has sufficiently proven its entitlement to damages pursuant to its breach of contract claim.  Plaintiff contends it is entitled to the remedy of recission in the amount of its downpayment ($323,604), less $5,000, in accordance with the one payment Defendants made to it, plus lost profits of "an estimated amount of $99,378.70."  (Pl.'s Mem. at 13.)  Accordingly, Plaintiff submits it is entitled to a judgment amounting to a sum of $417,982.70, plus prejudgment interest at the New York statutory rate of 9% and post-judgment interest at the federal statutory rate.  (Pl.'s Mem. at 13-14.)  The Court partially agrees.  As Defendants argue, Plaintiff has not sufficiently established its entitlement to lost profits vis-à-vis its purported "lost opportunities."  (*See* Defs.' Opp'n at 14.)

"When a buyer contracts to purchase goods and the seller fails to deliver, [N.Y.U.C.C.§2-711(1) (1964)] allows the frustrated buyer to recover . . . the price [already] paid" for said goods. *Eco-Fuels LLC v. Sarker*, No. 22-CV-250(KAM)(JAM), 2024 WL 779038, at *9 (E.D.N.Y. Feb. 26, 2024) (internal citations and quotations omitted).  In addition, the buyer is entitled to "the difference between the market price at the time when the buyer learned of the breach and the

9

contract price together with any incidental and consequential damages provided in this Article (Section 2–715), but less expenses saved in consequence of the seller's breach." N.Y. U.C.C. § 2–711(1) (1964). Here, it is undisputed that Plaintiff paid a downpayment in the amount of $323,604.00, which Defendants have failed to return except for the one-time payment of $5,000. (Defs.' Resp. 56.1 ¶¶ 24, 97.) Accordingly, Plaintiff is entitled to, at minimum, $318,604. *See Eco-Fuels LLC*, No. 22-CV-250(KAM)(JAM), 2024 WL 779038, at *9. However, for the reasons that follow, Plaintiff has not sufficiently established its claim for lost profits.

Lost profits are understood as the monies a non-breaching party would have received but for a beaching party's failure to fulfill its duties under a contract. *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007) (explaining that lost profit are those that are generated "[w]hen the breaching party does not perform, the non-breaching party's business is in some way hindered, and the profits from potential collateral exchanges are 'lost.'") The non-breaching parties' entitlement to lost profits derives from the notion that "the measure of the damage is the amount necessary to put the injured party in [the] exact position as [it] would have been if the contract had not been breached." *Perma Research & Dev. v. Singer Co.*, 542 F.2d 111, 116 (2d Cir.), *cert. denied*, 429 U.S. 987 (1976). "Under New York law, lost profits can be either general or consequential damages, depending on the nature of the lost profits in question." *SG Blocks, Inc. v. Osang Healthcare Co. Ltd.*, No. 21CV1990WFKSJB, 2022 WL 16787936, at *3 (E.D.N.Y. Sept. 22, 2022). "Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements." *Tractebel Energy Mktg., Inc.*, 487 F.3d at 109. "By contrast, when the non-breaching party seeks only to recover money that the breaching party agreed to pay under the contract, the damages sought are general damages." *Id.* Importantly, general damages only

10

require a reasonable estimate, while consequential damages must be established with reasonable certainty. *Id.* at 109-10  Further, a plaintiff is entitled to recover lost profits as consequential damages "only if (1) it is demonstrated with certainty that the damages have been caused by the breach, (2) the extent of the loss is capable of proof with reasonable certainty, and (3) it is established that the damages were fairly within the contemplation of the parties." *Id.* at 109.

Here, Plaintiff seeks lost profits as consequential damages, which is evidenced by its contention that it "lost out on numerous business opportunities" with third-party clients.  (Pl.'s Mem. at 13.)  However, based on the undisputed facts, Plaintiff has failed to meet any of the necessary conditions for the recovery of lost profits as consequential damages.  For example, nowhere in its papers or its Rule 56.1 statement does it indicate whether "lost profits" was contemplated by the parties.  Without sufficient proof of such, "[w]hether alleged lost profits were foreseeable and within the contemplate of the parties is a question of fact" inappropriate for summary judgment. *Cargo Logistics Int'l, LLC v. Overseas Moving Specialists, Inc.*, 723 F. Supp. 3d 212, 233 (E.D.N.Y. 2024) (collecting cases).

## II.     Plaintiff is Not Entitled to Summary Judgment on its Fraud Claim

To prevail on a fraud claim under New York law, a plaintiff must prove the following five elements by clear and convincing evidence:  "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." *Allstate Ins. Co. v Rozenberg*, 590 F Supp 2d 384, 394 (E.D.N.Y. 2008) (*quoting Lerner v Fleet Bank, N.A.*, 459 F3d 273, 291, n 8 (2d Cir 2006)).  "Clear and convincing evidence is evidence that makes the fact to be proved 'highly probable.'" *Abernathy–Thomas Eng'g Co. v. Pall Corp.*, 103 F.Supp.2d 582, 596 (E.D.N.Y. 2000) (quoting 1A New York Pattern Jury Instructions—Civil §

11

1:64 (3d ed.1999)). "'This evidentiary standard demands a high order of proof . . . and forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory.'" *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007) (alteration and citation omitted), *aff'd*, 354 F. App'x 496 (2d Cir. 2009). Although on summary judgment this standard may be established by circumstantial evidence, *id*, courts must "view summary judgment skeptically when assessing fraudulent inducement claims since those 'issues typically turn on the parties' credibility as to their state of mind.'" *Hernandez v. Money Source Inc.*, No. CV176919GRBAKT, 2021 WL 1402257, at *10 (E.D.N.Y. Mar. 5, 2021) (quoting *Century Pac.*, 528 F. Supp. 2d at 219); *see also ACLI Int'l Commodity Servs., Inc. v. Banque Populaire Suisse*, 609 F. Supp. 434, 449 (S.D.N.Y. 1984) ("[S]ummary judgment should be cautiously invoked in fraudulent inducement cases, which raise issues that often turn on credibility or inference, such as intent and reliance."). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

Here, Plaintiff argues Defendants fraudulently induced it to enter into both the Original Contract and the March 29 Agreement. (Pl.'s Mem. at 9-12.) In response, Defendants argue, in part, that there are material disputes of fact precluding Plaintiff's entitlement to summary judgment on its fraud claim. (Defs.' Opp'n at 8-9.) Defendants also argue, in part, that Plaintiff cannot establish reasonable reliance with respect to their purported misrepresentations. (Defs.' Opp'n at 13-15.) The Court agrees with these arguments made by Defendants.

### a. Plaintiff failed to establish, by clear and convincing evidence, that Defendants made material misrepresentations with respect to the Original Contract.

When addressing a motion for summary judgment, it is inappropriate for a Court to weigh and decide between competing testimony. *Panora v. Deenora Corp*, 467 F. Supp. 3d 38, 43 (E.D.N.Y. 2020) ("[A] court cannot make credibility determinations between competing testimony on summary judgment . . . ."). Here, in support of its fraudulent inducement claim, Plaintiff relies primarily on its Chief Financial Officer's, Dov Shtesl, declaration. (*See* Pl.'s Mem. at 9-12; Defs.' 56.1 ¶¶ 13-15, 21, 30.) However, most of the alleged material misrepresentations raised with respect to Plaintiff entering the Original Contract are meaningfully disputed by Defendants. For example, Plaintiff relied on Shtesl's Declaration in support of its assertions that "Defendants represented to Plaintiff that [they] had their own factory and manufactured their own products" and "did not tell Plaintiff that [they] were planning to get the gloves from an overseas factory." (Defs.' ¶¶ 14, 21.) Defendants disputed these statements by pointing to Defendant Johar's deposition, where he testified to telling Plaintiff—either before or at the time its order was placed—that the gloves they were seeking would be coming from Thailand. (Defs.' Resp. 56.1 ¶ 14 (citing Decl. of Abraham S. Beinhorn ("Beinhorn Decl."), Ex. A. at 34:14-35:9, ECF No. 47-14.) "Having been presented only with competing affirmations and no other evidence to weigh," this Court cannot find that Plaintiff has met its burden of showing that it is reasonably certain that Defendants misrepresented the gloves' origin. *B.N. ex rel. Novick v. Bnei Levi, Inc.*, No. 12-CV-5057, 2013 WL 168698, at *3 (E.D.N.Y. Jan. 15, 2013).

### b. Plaintiff has not demonstrated, by clear and convincing evidence, that it reasonably relied on any of Defendants' alleged misrepresentations.

Certain other statements that Plaintiff alleges to have been made by Defendants are non-actionable puffery. Statements are mere puffery, and hence unactionable, when they are "too

13

general to cause a reasonable [person] to rely upon them." *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757 (S.D.N.Y. 2018) (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)). Here, Plaintiff argues that it was fraudulently induced to enter the Original Contract because Defendants purportedly represented themselves as "veterans" and "particularly equipped to provide the gloves expeditiously." (Pl.'s Mem. at 11.) These statements are too broad and vague to be actionable. *See In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d at 757 (holding a company stating they were "on track to have [] products reach the market in 2016" as unactionable); *see also Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) ("Up to a point, companies must be permitted to operate with a hopeful outlook: 'People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.'" (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129–30 (2d Cir. 1994))).

Plaintiff also cannot be awarded summary judgment with respect to any of the alleged misrepresentations made prior to it entering into the March 29 Agreement because it has not shown that relying on those statements was reasonable. Indeed, Plaintiff made no effort to satisfy its burden on this element. Rather, Plaintiff nakedly states that it entered into the March 29 Agreement "reasonably[] relying on [] Defendants' explicit promises." (Pl.'s Mem. at 10.) At minimum, Plaintiff was required to show why it was reasonable to rely on Defendants' representations in connection with the March 29 Agreement immediately after Defendants failed to duly perform under the Original Contract. *See Keywell Corp. v. Weinstein*, 33 F.3d 159, 164 (2d Cir. 1994) ("When a party is aware of circumstances that indicate certain representations

may be false, that party cannot reasonably rely on those representations . . . . ") This is especially so where, as here, the parties are sophisticated business entities—which are held to a higher standard. *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 406 (S.D.N.Y. 2004) ("In assessing whether reliance on allegedly fraudulent misrepresentations is reasonable or justifiable, New York takes a contextual view, focusing on the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision . . . . [S]ophisticated business entities are held to a higher standard.").

      Moreover, the evidence cited by Plaintiff is too "equivocal" and "loose" for the Court to conclude as a matter of law that Plaintiff reasonably relied on certain statements when entering into the March 29 Agreement. *See Century Pac.*, 528 F. Supp. 2d at 219. Indeed, the Court has faced great trouble in discerning what is even being discussed or promised in the communications cited. For example, while the email thread attached to Shtesl's Declaration shows Defendant Johar stating he has "three more containers from different source[s that were] arranged at a very high price," this sentence is immediately followed by Defendant Johar indicating that he was working to ship those containers to "Abraham's clients." (Shtesl Decl., Ex. 4 at 2.) Plaintiff did not establish in its 56.1 Statement that Defendant Johar's reference to "Abraham's clients" is really a reference to Plaintiff—a notion that seems highly unlikely. (*See* Defs.' 56.1.) As such, it surely would not have been reasonable for Plaintiff to interpret Defendant Johar's statement that he was working to ship certain containers to someone else's client as a representation that any of those containers would now be provided to Plaintiff instead.

      For the foregoing reasons, Plaintiff's motion for summary judgment on its fraud claim is denied.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED in part and DENIED in part. Specifically, the Court grants summary judgment as to Defendant Meddcare's liability with respect to Plaintiff's breach of contract claim brought against it; and denies summary judgment with respect to Plaintiff's fraud claim brought against both defendants. The Court declines to award damages at this time. Rather, Plaintiff's damages are to be determined, in full, at a later plenary hearing or trial, along with other damages. *See Express Freight Sys. Inc. v. YMB Enters. Inc.,* 623 F. Supp. 3d 39, 55-56 (E.D.N.Y. 2022).

SO ORDERED.

Dated: Brooklyn, New York
      September 30, 2025

/s/ LDH
L<small>A</small>SHANN D<small>E</small>ARCY HALL
United States District Judge